UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| ARTIER LLC, a Florida Limited<br>Liability Company, EDUARDO<br>CASTANEDA, an Individual, and<br>MARTHA BLANCO, an Individual, | )<br>)<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | Case No.: 9:17-CV-80636-DMM |
| vs. | )<br>) | |
| CARRE D'ARTISTES SAS, a Foreign<br>Corporation, CARRE D'ARTISTES<br>USA CORP., a New York Corporation,<br>STEPHANIE TOSI, an Individual,<br>MARINA FAUVEY, an Individual,<br>PATRICE MARTINEAU, an<br>Individual, and CHARLOTTE<br>TROISGROS, an Individual, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants, | )<br>) | |
| _____/ | ) | |

## AMENDED COMPLAINT

Plaintiffs, Artier, LLC, Eduardo Castaneda, aMartha Blanco, by and through their attorneys, sue Defendants, Carre d'artistes SAS, Carre d'artistes USA Corp., Stephanie Tosi, Marina Fauvey, Patrice Martineau, and Charlotte Troisgros, and allege:

## NATURE OF THE CASE

1.      Defendants sold an illegal franchise to Plaintiffs in Boca Raton, Florida, in complete disregard of the disclosure requirements set forth in the Federal Trade Commission's Amended Franchise Rule, 16 C.F.R. § 436.1, *et seq* ("Amended FTC Franchise Rule"). As a result, Defendants have committed *per se* violations of FDUTPA. Defendants have also violated the Florida Franchise Act, Fla. Stat. Ann. §817.416 and the Florida Sale of Business Opportunities

Act, Fla Stat. Ann. §559.801 ("FSBOA"); committed fraud in the inducement; and breached the contract and the covenant of good faith and fair dealing. As a direct and proximate result of the actions and omissions of Defendants as described herein, Plaintiffs have incurred substantial monetary damages.

## PARTIES, JURISDICTION AND VENUE

2.      Plaintiff, Artier, LLC (also referred herein as "Artier"), is a limited liability company organized under the laws of Florida with a principal place of business in Boca Raton, Florida. The members of Artier are Eduardo Castaneda, who is domiciled in Florida, and Martha Blanco, who is domiciled in Florida. For diversity purposes, Artier is a citizen of Florida.

3.      Plaintiff, Eduardo Castaneda, is a citizen of Florida and domiciled in Florida and is otherwise *sui juris*.

4.      Plaintiff, Martha Blanco, is a citizen of Florida and domiciled in Florida and is otherwise *sui juris*.

5.      Defendant, Carre d'artistes SAS (referred herein as "Carre d'artistes"), is a foreign corporation organized under the laws of France with a principal place of business at 434, les Allees Francois Aubrun, RN7-Pallette-Le Tholonet, 13100, Aix en Provence, France. For diversity purposes, Carre d'artistes is a citizen of France.

6.      Defendant, Carre d'artistes USA Corp. ("Carre USA"), is a corporation organized under the laws of the State of New York with a principal place of business at 241 Bleecker Street, New York, NY 10014. For diversity purposes, Carre USA is a citizen of the State of New York.

7.      Defendant, Stephanie Tosi, is a citizen of France and domiciled in France and is otherwise *sui juris.*

2

8.      Defendant, Marina Fauvey, is a citizen of France and domiciled in France and is otherwise *sui juris*.

9.      Defendant, Patrice Martineau, is a citizen of France and domiciled in France and is otherwise *sui juris*.

10.     Defendant, Charlotte Troisgros, is a citizen of France and domiciled in France and is otherwise *sui juris*.

11.     This Court has original subject matter jurisdiction over Plaintiffs' claims in this action pursuant to 28 U.S.C. § 1332(a)(3) because the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and the parties are completely diverse. Specifically, this action is between citizens of different States and in which citizens or subjects of a foreign state are additional parties. As alleged herein, Plaintiffs are citizens of the State of Florida, and they are suing Carre d'artistes USA Corp., a citizen of the State of New York. The additional party Defendants, Carre d'artistes SAS, Stephanie Tosi, Marina Fauvey, Patrice Martineau, and Charlotte Troisgros, are citizens and/or subjects of a foreign state (France).

12.     This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 as the claims raise substantial questions of federal law including Defendants' violation of the Federal Trade Commission's Franchise Rule, as amended, 16 C.F.R. § 436.1, *et seq.* This Court has supplemental subject matter jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a).

13.     Defendants are subject to the long arm jurisdiction of this Court pursuant to Fla. Stat. § 48.193(1) because they operated, conducted, engaged in, and/or carried on a business or business venture within the state of Florida and/or had an office or agency in this state; committed a tortious act within the State of Florida; caused injury to persons within the state of Florida; things

processed, serviced and/or manufactured by Defendants were used or consumed within the state of Florida in the ordinary course of commerce, trade or use; Defendants breached a contract in the state of Florida.  Defendants are subject to the long arm jurisdiction of this Court pursuant to Fla. Stat. § 48.193(2) because they engaged in substantial and not isolated activity within the state of Florida by exercising control over an illegally sold franchise in this state;

14.    Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claim occurred in this District. Specifically, Defendants sold Plaintiffs an illegal franchise in Boca Raton, Florida, which gives rise to many of Plaintiffs' claims including its claims under federal and state franchise laws, breach of contract, and fraud.

## THE BACKDROP TO THE FEDERAL TRADE COMMISSION'S FRANCHISE DISCLOSURE REQUIREMENTS

15.    In the United States, the sale of a "franchise" is regulated in much the same fashion as the sale of a secured investment. Franchisors are prohibited from making projections of financial performance to prospective franchisees unless substantiated and by highly-detailed disclosure requirements (intended to provide prospective franchisees with all of the material information needed to make an informed decision).

16.    As reflected in the FTC's Statement of Basis and Purpose Relating to Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, Bus. Franchise Guide (CCH) ¶ 6300, *et seq.,* the FTC made the following material findings.

a.    "[M]isrepresentations and failure to disclose material facts are widespread in franchising." Bus. Franchise Guide (CCH) ¶ 6305.

b. "On the basis of the record in this proceeding, the Commission concludes that franchises have been marketed through (A) misrepresentation of material facts relevant to the nature and value of the franchise; (B) unsubstantiated claims regarding the potential sales, income, gross or net profit of franchises; (C) unfair refusal by franchisors to honor refund provisions and (D) failure to disclose material facts about the franchise offering." *Id.*

c. Many franchisors have made a practice of making "get rich quick" claims in advertisements and other promotional materials, and "such 'get rich quick' claims frequently either are unsubstantiated by the franchisor, or they misrepresent material facts with regard to the 'potential earnings' of a particular franchise business." *Id.* at ¶ 6304.

d. "[T]he record also discloses that many franchisors have highlighted the atypical success of a few franchisees without disclosing the non-representative nature of these claims. Such representations are an unfair and deceptive trade practice." *Id.* at ¶ 6307.

e. "For most prospective franchisees there is quite simply no source other than the franchisor for much of the information necessary to make an informed investment decision." *Id.* at ¶ 6304.

f. "The record establishes that prospective franchisees are at an informational disadvantage with respect to the franchisor in evaluating the franchise offering because of the setting in which franchises are sold. Because of this informational imbalance prospective franchisees do not have information about material aspects of the franchise and frequently are not even aware that they lack such information. Without such information, however, prospective franchisees cannot evaluate the value of the

franchise offering. The record establishes that franchisors take advantage of the informational imbalance to sell franchises without disclosure of material facts." *Id.* at ¶ 6309.

g.  "Without such information, prospective franchisees lack material information concerning the prices, the risks, the potential profitability, and even the nature and contents of the franchise offering." *Id.*

h.  "[T]he item being offered - the franchise opportunity – is complex, and the information necessary to test the accuracy of representations lies almost solely within the possession of the franchisor. Indeed, even if available, the search costs in obtaining such information would be prohibitive. Accordingly, prospective franchisees, of necessity, have to rely on the accuracy of the representation of the franchisor as to the profitability of the franchise." *Id.* at ¶ 6307 (emphasis added).

i.  "The failure to disclose material facts concerning the franchise offering, where the prospective franchisee is at an informational disadvantage, violates public policy encouraging informed consumer purchasing decisions." *Id.* at ¶ 6309.

j.  "Disclosure requirements are effective means of curbing the 'half-truth' and the failure to disclose used in marketing franchises because they provide prospective franchisees with at least the minimal information needed to make an informed decision whether to enter the franchise relationship. By specifying the type of information which should be provided, the rule prevents franchisors from selectively disclosing only the information which is favorable to them." *Id.* at ¶ 6312.

k.  "If franchisors choose to make representations concerning profits, income or sales to prospective franchisees or in the media," franchisors should be required to make

6

"certain disclosures which are intended to give the prospective franchisee information which will enable him or her to evaluate the merits of the franchisor's claim." *Id.*

17.     In 1979, the FTC adopted a trade regulation rule governing the sale of franchises that is roughly modeled on the SEC Act. *See* 16 C.F.R. Part 436 (the "FTC Franchise Rule").

18.     The FTC's Franchise Rule, as amended in 2007 (the "Amended FTC Franchise Rule"), requires a franchisor to provide a prospective franchisee with certain disclosures, contained in a written Franchise Disclosure Document ("FDD"), fourteen (14) days prior to the purchase of the franchise. *See* 16 C.F.R. § 436.1, *et seq.*

19.     Among the FDD disclosures are those required under Item 19 of the Amended FTC Franchise Rule. Item 19 of the FDD obligates a franchisor to present any "financial performance representation" in a detailed format that, among other things, identifies the percentage of existing system units which have actually achieved the financial results set forth in the franchisor's financial representation. *See* 16 C.F.R. § 436.5(s). A franchisor electing to make a financial performance representation must, among other things, have a reasonable basis and written substantiation for the representation at the time it is made, and disclose the bases and assumptions underlying the representation in Item 19. Franchisors are prohibited under the Amended FTC Franchise Rule against making representations that are not true or are not substantiated at the time they are made.

20.     Only the franchisor has accurate information regarding the financial performance reflected in the representations they share with prospective franchisees.

21.     A franchisor has the choice to make a financial performance representation in Item 19 (i.e., 16 C.F.R. § 436.5(s)) and can then only speak to such disclosure as written in Item 19. If the franchisor makes any financial performance representation to prospective franchisees, the franchisor must have a reasonable basis and written substantiation for the representation at the time

the representation is made and must state the representation in the Item 19 disclosure. The franchisor must also disclose the following:

a.   Whether the representation is an historic financial performance representation about the franchise system's existing outlets, or a subset of those outlets, or is a forecast of the prospective franchisee's future financial performance.

b.   If the representation relates to past performance of the franchise system's existing outlets, the material bases for the representation, including:

     i.   Whether the representation relates to the performance of all franchise system's existing outlets or only to a subset of outlets that share a particular set of characteristics (for example, geographic location, type of location (such as free standing vs. shopping center), degree of competition, length of time the outlets have operated, services or goods sold, services supplied by the franchisor, and whether the outlets are franchised or franchisor-owned or operated);

    ii.   The dates when the reported level of financial performance was achieved;

   iii.   The total number of outlets that existed in the relevant period and, if different, the number of outlets that had the described characteristics;

    iv.   The number of outlets with the described characteristics whose actual financial performance data were used in arriving at the representation;

    v.   Of those outlets whose data were used in arriving at the representation, the number and percent that actually attained or surpassed the stated results;

     vi.  Characteristics of the included outlets, such as those characteristics noted in paragraph (3)(ii)(A) of this section, that may differ materially from those of the outlet that may be offered to a prospective franchisee;

    vii.  If the representation is a forecast of future financial performance, state the material bases and assumptions on which the projection is based;

   viii.  The material assumptions underlying a forecast include significant factors upon which a franchisee's future results are expected to depend. These factors include, for example, economic or market conditions that are basic to a franchisee's operation, and encompass matters affecting, among other things, a franchisee's sales, the cost of goods or services sold, and operating expenses;

    ix.  A clear and conspicuous admonition that a new franchisee's individual financial results may differ from the result stated in the financial performance representation; and

    x.  A statement that written substantiation for the financial performance representation will be made available to the prospective franchisee upon reasonable request.

22.    Defendants knew or should have known that the business sold to Plaintiffs was a franchise under the laws of the United States and that the sale of said franchise to Plaintiffs required Defendants to have satisfied pre-sale disclosure obligations set forth in the Amended FTC Franchise Rule. Instead of adhering to the Amended FTC Franchise Rule and complying with the laws of our country, Defendants completely disregarded same and did not furnish Plaintiff with an FDD in the form and format required by the FTC.  The act of selling a security in the form of a

9

franchise in the United States without properly disclosing Plaintiffs subjects Defendants to *per se* civil liability under FDUTPA.

## FACTUAL BACKGROUND LEADING UP TO SALE OF ILLEGAL FRANCHISE

23.     On or about March 3, 2014, Plaintiff, Eduardo Castaneda ("Castaneda"), made first contact to Rodolphe Lecomte ("Lecomte"), owner of Carre d'artistes in New York City, New York, expressing interest in opening a Carre d'artistes location in the Middle East. Lecomte provided Castaneda with information for Defendant, Marina Fauvey ("Fauvey"), in France.

24.     On or about March 11, 2014, Castaneda contacted Fauvey expressing interest to open franchise locations in Qatar, Bahrain and Florida.

25.     On or about March 12, 2014, Fauvey responded that she was interested in opening Carre d'artistes franchises in Doha or Miami where they "don't have some franchises for the moment." Fauvey sent Castaneda a "Franchisee Form" to fill out.

26.     On or about March 13, 2014, Castaneda provided Fauvey the completed Franchisee Form and his Curriculum Vitae as support of his professional qualifications.

27.     On or about March 17, 2014, Fauvey advised Castaneda that he was accepted as a candidate for a franchise in Doha, Qatar, or Miami.

28.     On or about March 23, 2014, Castaneda requested that Fauvey share financial information during the first meeting set for April 4, 2014.

29.     On or about April 4, 2014, Castaneda met with Fauvey at Carre d'artistes' New York City franchise location.

30.     On or about April 7, 2014, Castaneda followed up the meeting with an email requesting financial representations about the franchise opportunity including projected start-up

costs, projected sales based on current franchise performance, operating expenses, and costs of goods sold, to give Castaneda the opportunity to better understand the risks of ownership in the Carre d'artistes franchise system.

31.     On April 10, 2014, Fauvey provided Castaneda with financial information from Carre d'artistes' Lyon, France, location, and represented that the Lyon location would be similar to the franchise location in Miami. Castaneda used the gross sales figures from Lyon and put together a 12-page "business plan" setting forth projections for his franchise and sent it to Fauvey for comment but none was given.

32.     On or about April 14, 2014, Fauvey responded to additional questions from Castaneda and made additional misrepresentations about the viability of the business including the fact that London was one of its successful locations despite that location having already been closed. Moreover, Fauvey provided gross sales estimates of other franchise locations as a representation of what Castaneda could make through his franchise in Florida which expressly violates the Amended FTC Franchise Rule.

33.     On or about April 17, 2014, Fauvey provided Castaneda with the "Document Information Precontractuelle au contrat de Franchise Floride-Doha."

34.     On or about April 22, 2014, Fauvey provided additional financial information about the sales at other Carre d'artistes franchise locations. Fauvey also advised that Carre d'artistes would provide commentaries on Castaneda's proposed business plan and pro forma based on sales figures already provided.

35.     On or about April 29, 2014, Castaneda provided Carre d'artistes with a business plan using the improperly disclosed financial representations from Lyon which included a pro forma on expected revenues and profits in the proposed location in Florida.

36.     On or about May 11, 2014, Castaneda provided Fauvey with a translated version of the original agreement to English.

37.     The agreement was executed by the parties on or about May 22, 2014.

38.     On or about May 26, 2014, Plaintiffs provided Fauvey with a check for 15,000 Euro (approximately $20,454.50 USD at the time of payment) as an initial franchise fee.  Carre d'artistes confirmed to Plaintiffs that the money was received and welcomed Plaintiffs into the franchise network.

**THE NEW "DIP" CONTRACT AND TIMELINE OF EVENTS AND
MISREPRESENTATIONS BY FRANCHISOR AFTER FRANCHISE FEE PAID**

39.     After the original agreement was executed, Carre d'artistes continued to provide Plaintiffs with additional, misleading financial information from the Lyon franchise location including by email on July 21, 2014.

40.     On or about August 14, 2014, Fauvey arrived in South Florida to scout locations for Plaintiffs' Carre d'artistes franchise.

41.     On or about November 21, 2014, Fauvey provided sales from all of the locations for the previous two months (September and October 2014) for the entire franchise system including galleries in New York (NY), Sedona (AZ), and Montreal. The actual numbers provided were not indicative of the representations made about the financial strength of the franchise locations made prior to Plaintiffs paying the franchise fee. On information and belief, the Montreal franchise location had since closed as of that date.

42.     In or about January 2015, Plaintiffs met with Carre d'artistes, its staff at meeting with franchisees in the United States. The presentation included the franchisees from Montreal to

tout the strength of the brand. Plaintiffs learned later that prior to the meeting, on or about December 24, 2014, the Montreal location had closed.

43.     The January 2015 meeting also revealed that the financial strength of the galleries was not as strong as represented prior to the Plaintiffs paying the initial franchise fee. After this meeting, Castaneda voiced concerns to Carre d'artistes about the lack of transparency with sales figures and financial strength of the galleries.

44.     On or about May 5, 2015, Castaneda and Fauvey agreed to the final revisions of a new agreement to separate the Florida and Doha locations. A copy of the new Florida agreement incorrectly dated March 10, 2015, is attached hereto as **Exhibit "A"**.  The agreement attached hereto as Exhibit "A" is referred herein as the "DIP" due to the French title "Document Information Precontractuelle".

45.     On or about June 15, 2015, Fauvey provided Castaneda with a website link to a franchise development brochure dated June 2015 which included the same misleading information used to induce Plaintiffs into signing the DIP including the following:

      a.  "[Franchisor would provide] [h]elp with producing the business plan;"

      b.  "[Franchisor would provide] [h]elp with the gallery organization plan;"

      c.  "[Franchisor would provide] [t]ransmission of expertise;"

      d.  "[Franchisor would provide a] [r]egular supply of artworks in quality and quantity;"

      e.  "[Franchisor would provide a] [t]raining program (initial-continued);"

      f.  "[Franchisor would provide] [r]egular activity follow-up, analysis of results;"

      g.  "[Franchisor would provide] [r]ecommendations for improvement;"

      h.  "[Franchisor would provide a] [m]arketing strategy;"

      i.  "Concept proven in different countries and cultures;"

j. "Consignment system limits investment and facilitates management of accounts;"

k. "Opening of several fast points of sale on the granted territory;"

l. "Consumer sales price policy freely devised by the Franchisee;"

m. "Team of experts dedicated to the development of galleries;"

n. "Strength of an international network;"

o. "Increasing strength in the visibility of the brand;" and

p. "Adapted marketing strategy."

46.     Plaintiffs did not experience any of these benefits to being a franchisee. These representations are and were false. The brochure also included costs that varied significantly from what was experienced by Plaintiffs.

### LACK OF SUPPORT AND COMPETITION LEADING UP TO AND AFTER BOCA RATON GALLERY OPENS

47.     The pricing model of the franchise relationship was such that the franchisee would have autonomous control to set public pricing. The franchisee's profit would be derived from the sales price at retail less the fixed amount paid to the franchisor for the piece of art. On or about July 1, 2015, Defendants increased the price of art on their end before Plaintiffs opened the door of their franchise location in Boca Raton.

48.     On or about September 13, 2015, Castaneda turned down two of the 12 artists that Carre d'artistes requested be displayed in Boca Raton at the opening due to his concerns about quality of the art pieces. The franchisor required that the pieces be sold, and the artists were the worst performing artists ever exhibited in the Boca Raton gallery.

49.     On or about September 15, 2015, the Carre d'artistes gallery in Boca Raton, Florida, opened in Mizner Park without any assistance from Defendants.

14

50.     On or about October 8, 2015, Plaintiffs emailed Carre d'artistes requesting marketing materials and higher-end packaging.

51.     Two months after opening, a Carre d'artistes representative who, on information and belief, was not employed by Carre d'artistes, visited Plaintiffs' franchise location to provide training.

52.     On or about December 31, 2015, Castaneda notified Defendants in writing that the pricing of the same size of artwork being sold in Boca Raton was being sold far less expensive than on the Carre d'artistes website. The paintings sold by Carre d'artistes and the franchisees are unique but pricing is based on size. For example, a 5" x 5" painting in Boca Raton would sell for $115 but, on the website, that same size painting was selling for 75 Euro (or about $81 USD).

53.     Castaneda's email was not responded to until February 10, 2016, when Patrice Martineau, then CEO of Carre d'artistes, responded by advising Castaneda that the franchisor was unable to remedy the problem due to the costs of a multi-website. Martineau acknowledged that franchisees "benefit" from an attractive buying price but that franchisees are free to sell to the public at whatever price the market will bear. The failure of Carre d'artistes to remedy this issue (1) cost an immeasurable amount of sales, including at least one customer walking away from a $5,000 art sale due to a more competitive price listed on the franchisor's website, and (2) essentially changed the deal between the parties as it took the freedom away from Plaintiffs to price the art at what they considered to be market value in South Florida due to the competitive pricing on the franchisor's website.

54.     On or about March 17, 2016, Carre d'artistes' "Area Manager U.S.A." Charlotte Troisgros ("Troisgros") visited the Plaintiffs' franchise location for a signing event. While her role for Carre d'artistes and Carre USA was to develop and strengthen Carre d'artistes network in the

U.S. and to open new galleries, Troisgros treated Plaintiffs' staff disrespectfully and recommended that one of Plaintiffs' employees be fired without any valid reasoning.

55.    On or about March 31, 2016, Plaintiffs first learned that Defendants were engaging in a pay-per-click internet marketing campaign to drive internet traffic and potential customers searching for Carre d'artistes in Boca Raton to the franchisor's website

56.    On or about April 11, 2016, Castaneda sends multiple emails to Troisgros about setting up a bank account in France to avoid wire and currency exchange fees but no substantive response was provided. No response from Defendants was a common theme as multiple emails from Castaneda voicing questions and concerns about important topics like artists' issues with the platform, inability to retain quality artists, supporting Plaintiffs' Boca Raton franchise, price increases, the website, marketing opportunities, and changes to the central platform, went unanswered.

57.    On or about May 15, 2016, Carre d'artistes prepared a city guide for all of their franchise locations but, instead of doing one for Boca Raton, they prepared it for Miami which is 50 miles south of Plaintiffs' location.

58.    On or about June 6, 2016, Castaneda requested that Carre d'artistes disclose who their best-selling artists were and how they rank. Defendants used their franchisees as guinea pigs to test artists and how their art sold and, if there was success, the artist would be asked to exhibit online for benefit of the franchisor or moved to the franchisor-owned locations.

59.    On or about July 1, 2016, Defendants increased the price of art to be sold to Plaintiffs thereby decreasing Plaintiffs' profit margin for the second time in less than a year.

60.    On or about July 15, 2016, Defendants' launched a new "logistics platform" to have art shipped from the artist to headquarters in France and then France would distribute the art to the

galleries monthly based on the number of orders placed. Defendants flooded existing artists in the system with unreasonable order requests and failed to obtain enough stock to support the new platform. The focus by the franchisor on quantity over quality, combined with extended shipping times from artist to France to Boca Raton, caused significant drops in sales at Plaintiffs' gallery. Before this change, the local artists would ship directly to Boca Raton but, after the change, Plaintiffs were subjected to additional import fees from France. Defendants also retained artwork that was "sellable" and distributed less desirable pieces to Plaintiffs and other franchisees. Specifically, Defendants kept best-selling artists in Carre d'artistes-owned locations which affected the quality of art sold in Plaintiffs' franchise store. Plaintiffs suffered immeasurable losses due to a poor artistic mix as a result of Defendants' conflict of interest in the art selection process.

61.     On or about July 16, 2016, Troisgros provided Castaneda with an updated franchise development brochure which included the same misrepresentations that were made to Plaintiffs before and after signing the DIP and made to induce Plaintiffs into paying the franchise fee to become a Carre d'artistes franchisee.

62.     Plaintiffs did not experience any of these benefits to being a franchisee. These representations are and were false.

63.     Despite not being registered to legally sell franchises in the United States, the franchise development brochure also featured testimonials from two U.S. franchisees: Lecomte in New York City and Denise and Giora Israel in Sedona, Arizona.

64.     Shortly after these testimonials were made, the franchisees proceeded to leave the franchise system to be bought out by Carre d'artistes or one of Carre d'artistes' U.S. companies.

65.     Defendants either personally or on a corporate level now operate the locations in Sedona and New York City leaving only two other "franchises" in the United States in Atlanta and Philadelphia.

66.     The pricing model of the franchise relationship was such that the franchisee would have autonomous control to set public pricing. The franchisee's profit would be derived from the sales price at retail less the fixed amount paid to the franchisor for the piece of art. On or about July 1, 2015, Defendants increased the price of art to be sold to Plaintiffs before Plaintiffs opened the door of their franchise location in Boca Raton.

67.     On or about July 28, 2016, Plaintiffs emailed Defendants about a large sale opportunity for a yacht interior designer.  This email went unanswered by the franchisor.

68.     On or about August 2, 2106, Plaintiffs emailed Defendants requesting information on an art fair to assist them with participating in a Miami art fair. Defendants failed to answer this email.

69.     The franchisor was unable to attract artists to sell their art at Plaintiffs' gallery. This flaw in the franchisor's system hurt Plaintiffs' relationship with the local art community. The only two local artists were found by Plaintiffs, and these artists were two of the best performing artists in the gallery. One of these artists left the system due to the lack of organization of Defendants.

70.     Urban art was the top selling style in New York and Philadelphia franchise locations. Defendants did not send any paintings in that style to Boca Raton which caused Plaintiffs a significant loss in sales.

71.     On or about October 31, 2016, Plaintiffs notified Defendants in writing that, if they were unable to secure a top-selling local artist exhibiting large format paintings and urban art, Plaintiffs' sales during the high season would be declining by thirty percent (30%).

72.     All conditions precedent to bringing this action have occurred, have been waived, or have been otherwise satisfied.

73.     Plaintiffs retained the services of the undersigned attorneys and have agreed to pay said attorneys a reasonable fee to prosecute this action.

## COUNT  I

## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT AGAINST ALL DEFENDANTS

74.     Paragraphs 1 through 73 are re-alleged and incorporated by reference.

75.     This is an action for violation of the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 *et seq.*, Florida Statutes ("FDUTPA").

76.     At all times material to this action, Plaintiffs were "consumers" as that term is defined under FDUTPA, Section 501.2011(7), Florida Statutes.

77.     Section 501.201(3), Florida Statutes, provides that violations of the rules promulgated under the Federal Trade Commission Act, 16 C.F.R. § 436.1 *et seq.* are violations of FDUTPA.

78.     Carre d'artistes is a "franchisor" as defined in the Amended FTC Franchise Rule, 16 C.F.R. § 436.1(k).

79.     FDUTPA is applicable as the sale of the franchise was made in Florida, the franchisee is in Florida and are residents of Florida, and the fraudulent conduct alleged herein primarily occurred in Florida. Regardless, FDUTPA has no geographical or residential restrictions.

80.     Without limitation, Defendants, Carre d'artistes and Carre USA, violated the Amended FTC Franchise Rule and consequently FDUTPA, and committed unfair or deceptive acts or practices, by making misrepresentations concerning their expertise and knowledge of the

services and products offered and sold to Plaintiffs; making fraudulent earnings claims; making misrepresentations concerning earnings, and third-party vendors; failing to uphold even minimal standards in operating a franchise system; failure to provide proper and adequate support and assistance; failure to provide proper training; making multiple misrepresentations as to the alleged expertise and sophistication of franchisor; lack of proper assistance by franchisor; failing to properly maintain the high standards supposedly set by franchisor in connection with its franchise system; failure to provide assistance to the franchisee in the establishment of its franchise; failure to create, improve and/or maintain brand recognition or brand loyalty; directly competing with Plaintiffs through internet marketing efforts and retaining "sellable" artwork; directing Plaintiffs to purchase artwork that was unsellable; and numerous other misrepresentations in connection with the DIP and the system.

81. Defendant, Carre d'artistes, committed *per se* violations of FDUTPA by falling short of the requirements of the disclosure rules in the Amended FTC Franchise Rule as follows:

a. Failing to furnish a prospective franchisee, Artier, Castaneda and Blanco, with a copy of a valid franchise disclosure document (FDD) that complied with subparts C and D of Part 436, at least 14 calendar-days before Plaintiffs paid an upfront franchise fee and signed a binding agreement with the franchisor in violation of 16 C.F.R. § 436.2(a);

b. Failing to title the DIP as a "Franchise Disclosure Document" and to otherwise provide a compliant "Cover Page", including a representation of the total investment necessary for Plaintiffs to begin operation of a franchise, in the form and format required by 16 C.F.R. § 436.3;

c. Failing to include an "Table of Contents" in violation of 16 C.F.R. § 436.4;

d.  Failing to provide the requisite information about the franchisor, predecessors and affiliates typically found in an FDD Item 1 in violation of 16 C.F.R. § 436.5(a);

e.  Failure to provide the general market for the product or service the franchisee will offer which must consider factors such as whether the market is developed or developing, whether the goods will be sold primarily to a certain group, and whether sales are seasonal in violation of 16 C.F.R. § 436.5(a)(6)(iv);

f.  Failure to disclose by name and position the franchisor's directors, trustees, general partners, principal officers, and any other individuals who will have management responsibility relating to the sale or operation of franchises offered by this document including, for each, their principal positions and employers during the past five years, including each position's starting date, ending date, and location which is typically found in FDD Item 2 in violation of 16 C.F.R. § 436.5(b);

g.  Failure to disclose the 10-year litigation history of the franchisor and franchisor's parent, affiliates, and any persons that should have been identified in FDD Item 2 which is typically found in FDD Item 3 in violation of 16 C.F.R. § 436.5(c);

h.  Failure to disclose the 10-year bankruptcy history of the franchisor and franchisor's parent, affiliates, and any persons that should have been identified in FDD Item 2 which is typically found in FDD Item 4 in violation of 16 C.F.R. § 436.5(d);

i.  Failure to disclose the initial fees and any conditions under which the fees are refundable which is typically found in FDD Item 5 in violation of 16 C.F.R. § 436.5(e);

j.  Failure to disclose in tabular form all other fees that the franchisee must pay to the franchisor or its affiliates, or that the franchisor or its affiliates impose or collect in

21

whole or in part for a third party which is typically found in FDD Item 6 in violation of 16 C.F.R. § 436.5(f);

k.  Failure to disclose, in tabular form, the franchisee's estimated initial investment under the heading "YOUR ESTIMATED INITIAL INVESTMENT" in capital letters using bold type which is typically found in FDD Item 7 in violation of 16 C.F.R. § 436.5(g);

l.  Failure to disclose the franchisee's obligations to purchase or lease goods, services, supplies, fixtures, equipment, inventory, computer hardware and software, real estate, or comparable items related to establishing or operating the franchised business either from the franchisor, its designee, or suppliers approved by the franchisor, or under the franchisor's specifications which is typically found in FDD Item 8 in violation of 16 C.F.R. § 436.5(h);

m.  Failure to disclose, in tabular form, a list of the franchisee's principal obligations under the heading "FRANCHISEE'S OBLIGATIONS" in capital letters using bold type which is typically found in FDD Item 9 in violation of 16 C.F.R. § 436.5(i);

n.  Failure to disclose the terms of each financing arrangement, including leases and installment contracts, that the franchisor, its agent, or affiliates offer directly or indirectly to the franchisee which is typically found in FDD Item 10 in violation of 16 C.F.R. § 436.5(j);

o.  Failure to disclose the franchisor's principal assistance and related obligations of both the franchisor and franchisee including, but not limited to, the franchisor's training program in tabular form under the heading "TRAINING PROGRAM"; locating a site and negotiating the purchase or lease of site; whether and how the

franchisor must approve a franchisee-selected site; the factors that the franchisor considers in selecting or approving sites (for example, general location and neighborhood, traffic patterns, parking, size, physical characteristics of existing buildings, and lease terms); conforming the premises to local ordinances and building codes and obtaining any required permits; constructing, remodeling, or decorating the premises; hiring and training employees; providing for necessary equipment, signs, fixtures, opening inventory, and supplies; the typical length of time between the earlier of the signing of the franchise agreement or the first payment of consideration for the franchise and the opening of the franchisee's business; whether franchisor will have the obligation to establish prices, establish and use administrative, bookkeeping, accounting and inventory control procedures, and resolve operating problems encountered by franchisee; describing the advertising program for the franchise system; whether the franchisor has the obligation to conduct advertising; and providing the table of contents of the franchisor's operating manual which is all typically found in FDD Item 11 in violation of 16 C.F.R. § 436.5(k);

p.   Failure to disclose information related to trademarks, territories, proprietary information, what involvement a franchisee must have in the business, and what a franchisee may sell which is typically found in FDD Items 12 through 16 in violation of 16 C.F.R. § 436.5(l)-(p);

q.   Failure to disclose, in tabular form, a table that cross-references each enumerated franchise relationship item with the applicable provision in the franchise or related

agreement under the heading "THE FRANCHISE RELATIONSHIP" which is typically found in FDD Item 17 in violation of 16 C.F.R. § 436.5(q);

r.   Failure to disclose whether any public figures were involved in the franchise system which is typically found in FDD Item 18 in violation of 16 C.F.R. § 436.5(r);

s.   Failure to include the following statement required by which is typically found in FDD Item 19 in violation of 16 C.F.R. § 436.5(s)(1):

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

t.   Additional breaches of FDD Item 19 disclosure requirements related to financial performance representations as follows:

   i.   Presenting Plaintiffs with financial representations that were not included in an FDD in violation of 16 C.F.R. §§ 436.5(s)(l) and (5);

   ii.   Presenting Plaintiffs with financial representation which had no "reasonable basis" as required by 16 C.F.R. §§ 436.5(s)(l) and (3);

   iii.   Making financial representations without having "written substantiation" of the financial performance claims set forth in the representation as required by 16 C.F.R. § 436.5(s)(3);

   iv.   Presenting Plaintiffs with a financial representation without identifying whether the content of the financial representation "is an historic financial performance representation about the franchise system's existing outlets, or

24

a subset of those outlets, or is a forecast of the prospective franchisee's future financial performance" as required by 16 C.F.R. § 436.5(s)(3)(i);

v. Presenting Plaintiffs with a financial representation without identifying the "material bases" for its content as required by 16 C.F.R. §§ 436.5(s)(3)(ii) and (iii);

vi. Presenting Plaintiffs with a financial representation without identifying whether its content "... relates to the performance of all of the franchise system's existing outlets or only to a subset of outlets that share a particular set of characteristics (for example, geographic location, type of location (such as free standing vs. shopping center), degree of competition, length of time the outlets have operated... and whether the outlets are franchised or franchisor-owned or operated)" as required by 16 C.F.R. § 436.5(s)(3)(ii)(A);

vii. Presenting Plaintiffs with a financial representation without identifying the "dates when the reported level of financial performance was achieved" as required by 16 C.F.R. § 436.5(s)(3)(ii)(B);

viii. Presenting Plaintiffs with a financial representation without identifying the "number of outlets with the described characteristics whose actual financial performance data were used in arriving at the representation" as required by 16 C.F.R. § 436.5(s)(3)(ii)(D);

ix. Presenting Plaintiffs with a financial representation without identifying "the number and percent that actually attained or surpassed the stated results" amongst existing units as required by 16 C.F.R. § 436.5(s)(3)(ii)(E);

x. Presenting Plaintiffs with a financial representation without identifying the "[c]haracteristics of the included outlets ... that may differ materially from those of the outlet" offered to Plaintiffs by Defendants as required by 16 C.F.R. § 436.5(s)(3)(ii)(F);

xi. Presenting Plaintiffs with a financial representation without also providing Plaintiffs, in writing, a "clear and conspicuous admonition that a new franchisee's individual financial results may differ from the result stated in the financial performance representation" as required by 16 C.F.R. § 436.5(s)(3)(iv);

xii. Presenting Plaintiffs with a financial representation without also providing Plaintiffs, in writing, a "statement that written substantiation for the financial performance representation will be made available to the prospective franchisee upon reasonable request" as required by 16 C.F.R. § 436.5(s)(5); and

xiii. Presenting Plaintiffs with a financial representation without explaining why Defendants failed to include the financial representation information in an FDD as required by 16 C.F.R. § 436.5(s)(5)(ii).

u. Failure to disclose a system-wide outlet summary which is typically found in FDD Item 20 in violation of 16 C.F.R. § 436.5(t); and

v. Failure to disclose or provide financial statements prepared according to United States generally accepted accounting principles in violation of 16 C.F.R. § 436.5(u).

82.    Carre d'artistes further violated FDUTPA and Section 436.9 of the Amended FTC Franchise Rule in the following ways:

a. Defendants made claims and representation, orally, visually, or in writing, that contradicts the information required to be disclosed by this part in violation of 16 C.F.R. § 436.9(a);

b. Defendants misrepresented that certain franchisees were remaining in the system and that franchisees were able to provide an independent and reliable report about the franchise or the experiences of any current or former franchisees in violation of 16 C.F.R. § 436.9(b);

c. Defendants disseminated financial performance representations to Plaintiffs without a reasonable basis and written substantiation for the representation at the time the representation is made in violation of 16 C.F.R. § 436.9(c);

d. Defendants failed to make available to prospective franchisees written substantiation for any financial performance representations made in Item 19 (§436.5(s)) in violation of 16 C.F.R. § 436.9(d); and

e. Defendants' failed to furnish a copy of the FDD to Plaintiffs at any point in the sales process as required by § 436.2.

83.     Section 436.6 of the Amended FTC Franchise Rule states that "It is an unfair or deceptive act or practice in violation of Section 5 of the FTC Act for any franchisor to fail to include the information and follow the instructions for preparing disclosure documents set forth in subpart C (basic disclosure requirements) and subpart D (updating requirements) of part 436" generally set forth above.

84.     Pursuant to Fla. Stat. § 501.203, a per se violation of FDUTPA is established by the violation of any rule promulgated pursuant to the Federal Trade Commission Act, and by the

27

violation of any statute, rule, or regulation proscribing unfair or deceptive practices including § 436.2 of the Amended FTC Franchise Rule. *See* Fla. Stat. § 501.203(3)(a), (c).

85.    Carre d'artistes' violations of the Amended FTC Franchise Rule in dealings with Plaintiffs constituted unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices under FDUTPA.

86.    Upon information and belief, these acts were committed knowingly, willfully, intentionally, and with actual awareness of the unfairness of the acts.

87.    Carre d'artistes' acts and practices described in this Count have caused damages to Plaintiffs.

88.    The individual Defendants, Fauvey, Tosi, Martineau, and Troisgros (the "Individual Carre Defendants"), were either owners of Carre d'artistes or held executive-level positions, and actively participated in and had some measure of control over the franchisor's deceptive practices. These Individual Carre Defendants had or should have had knowledge or awareness of the misrepresentations and FDUTPA violations discussed in this Count.

89.    Plaintiffs have been required to retain the services of the undersigned counsel to bring this action and is entitled to an award of a reasonable attorney's fee pursuant to Section 501.2105, Florida Statutes.

WHEREFORE, Plaintiffs, Artier, LLC, Eduardo Castaneda and Martha Blanco, demand judgment against Defendants for actual damages, plus pre-judgment interest, a reasonable attorney's fee, court costs and such other and further relief as the Court may deem just and proper.

## COUNT II

## VIOLATION OF THE FLORIDA FRANCHISE ACT FLA. STAT. ANN. § 817.416 AGAINST ALL DEFENDANTS

90.     Paragraphs 1 through 73 are re-alleged and incorporated by reference.

91.     Carre d'artistes is a franchisor within the meaning of Section 817.416, Florida Statutes.

92.     In selling and establishing the franchise, Carre d'artistes violated Section 817.416(2)(a), Florida Statutes. Before DIP was signed, Carre d'artistes, through the Individual Carre Defendants, intentionally misrepresented to Plaintiffs the prospects or chances for success regarding the proposed franchise and intentionally misrepresented to Plaintiffs the known required total investment for the proposed franchise.

93.     In order to induce Plaintiffs to purchase and operate a franchise, Carre d'artistes, through the Individual Carre Defendants, intentionally misrepresented to Plaintiffs the prospects or chances for success regarding the proposed franchise by providing Plaintiffs with financial representations, including sales figures, which were intentionally false and misleading.

94.     The individual Defendants, Fauvey, Tosi, Martineau, and Troisgros (the "Individual Carre Defendants"), were either owners of Carre d'artistes or held executive-level positions, and actively participated in and had some measure of control over the franchisor's practices in violation of the Florida Franchise Act.

95.     Plaintiffs have been required to retain the services of the undersigned counsel to bring this action and is entitled to an award of reasonable attorney's fees pursuant to Section 817.416(3), Florida Statutes.

WHEREFORE, Plaintiffs, Artier, LLC, Eduardo Castaneda and Martha Blanco, demand judgment against Defendants for actual damages, plus pre-judgment interest, a reasonable attorney's fee, court costs and such other and further relief as the Court may deem just and proper.

## COUNT III

## FRAUDULENT INDUCEMENT AGAINST ALL DEFENDANTS

96.     Paragraphs 1 through 73 are re-alleged and incorporated by reference.

97.     To induce Plaintiffs to purchase and operate a Carre d'artistes franchise, Defendants, Carre d'artistes and Carre USA, through the Individual Carre Defendants, made false representations of material fact to Plaintiffs including, but not limited to the following:

a. Providing Castaneda with requested financial information with sales figures from the Lyon franchise location and falsely representing that the Lyon franchise was indicative of what Plaintiffs could expect operating a franchise in South Florida;

b. Providing Castaneda with general sales figures of the top grossing store and the lowest grossing store where the figures provided were not accurate and reflective of actual sales by these franchisees;

c. Misrepresenting the ease of the process of rotating artists in and out of Plaintiffs' franchise location;

d. Misrepresenting that taxes were low when art was shipped from France to the United States;

e. Misrepresenting that top producing galleries sell around 3,500-4,000 paintings per year while a small gallery sells between 1,500-1,800 per year (Plaintiffs' franchise in Boca Raton sold 453 paintings in 2016);

f.  Misrepresenting that the average sales of the franchise system was approximately 500,000 Euro (approximately $694,000 USD at the time the representation was made);

g.  Misrepresenting the success of other locations when numerous locations were struggling or closing, including, but not limited to the franchise locations in Montreal (Canada), New York City (New York), Sedona (AZ), London (United Kingdom), and Bonn (Germany);

h.  Misrepresenting that the franchisor would provide adequate guidance, assistance or support in connection with operating the Plaintiffs' franchise unit;

i.  Misrepresenting the brand strength and that the franchisor would provide marketing efforts and support;

j.  Misrepresenting that the franchisor would provide adequate pre-opening training; and

k.  Misrepresenting the base price sale of art to the franchisee which the franchisor increased two months prior to Plaintiffs' opening their doors and then again approximately ten months after Plaintiffs' opened.

98.  Defendants knew or should have known these representations as to Plaintiffs' prospective earnings and the viability of the Carre d'artistes franchise offering were false as the Carre d'artistes franchise "system" was still developing before, during, and after Plaintiffs signed the DIP. An "established" franchise system would first consider legal compliance before selling franchise units in the United States in complete disregard for the laws protecting franchisees.

99.  Among other discretions set forth herein, Defendants, Carre d'artistes, and Carre USA, continuously implemented failed programs, which alienated franchisees and quality artists,

31

continuously took actions that negatively impacted Plaintiffs' sales, and used Plaintiffs as a guinea pig in a learn-as-you-go approach to operating a franchise in the United States.

100.    Defendants were in a position to know the veracity of the information being supplied and, as a franchisor, was in a special position of superiority and/or privity with Plaintiffs which required Defendants to impart truthful and correct information to Plaintiffs.

101.    Defendants, Carre d'artistes and Carre USA, through the Individual Carre Defendants, made these false representations to induce Plaintiffs to move forward with the purchase of the franchise, and to pay substantial sums of personal money to Defendants.

102.    Plaintiffs did not know, have reason to know, nor could have discovered, through the exercise of reasonable diligence, the falsity of the foregoing misrepresentations when made.

103.    Plaintiffs reasonably relied on the false representations made by Defendants and suffered damages due to this reliance.

104.    But for the false representations made by Defendants, Plaintiffs would not have moved forward with the purchase of their franchise.

WHEREFORE, Plaintiffs, Artier, LLC, Eduardo Castaneda and Martha Blanco, demand judgment against Defendants for actual damages, plus pre-judgment interest, a reasonable attorney's fee, court costs and such other and further relief as the Court may deem just and proper.

## COUNT IV

## BREACH OF CONTRACT AND COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST CARRE D'ARTISTES

105.    Paragraphs 1 through 73 are re-alleged and incorporated by reference.

106.    On or about May 5, 2015, Plaintiffs and Carre d'artistes entered into the DIP.

107.    Defendant, Carre d'artistes, breached its obligations under the DIP in ways that include, but are not limited to, the following:

a. Failing to provide an adequate concept, expertise, and methods for Plaintiffs to distribute goods and services to its clientele in breach of DIP Section 1;

b. Failing to convey "expert working knowledge including technical methods" and "processes developed, tested and applied for many years in multiple retail outlets" in breach of DIP Section 4;

c. Failing to share any knowledge through frequent, regular, planned and strategic communication with Plaintiffs and through multiple services in breach of DIP Section 4;

d. Failing to provide adequate guidance and assistance to Plaintiffs for the setup of the retail unit/franchise including, but not limited to, in the areas of area selection, experience and expertise of local clientele, knowledge transfer of the franchisor's processes, pre-open training, post-open training, development of a local communication plan, development of a pricing policy aimed at maximizing profitability in breach of DIP Section 4.1;

e. Failing to conservatively and carefully estimate the capital investment required to open a franchise location and submitting same to Plaintiffs in breach of DIP Section 4.1;

f. Failure to support and assist Plaintiffs in opening their franchise unit by providing a Carre d'artistes manager on-site for at least two days in breach of DIP Section 4.2;

g. Failure to provide general commercial and technical assistance to open the Plaintiffs' franchise unit in favorable conditions in breach of DIP Section 4.2;

h. Failure to conduct a meaningful yearly audit in breach of DIP Section 4.3;

i. Failure to analyze Plaintiffs' performance, to ensure continuous staff training on sales techniques, and to support the franchisee in recruiting or training staff on sales techniques in breach of DIP Section 4.3;

j. Failure to "answer all questions of the Franchisee" and to "provide advice on running costs and margins" in breach of DIP Section 4.3;

k. Failure to provide adequate works of art up to standards, image and reputation portrayed by the franchisor to Plaintiffs including by providing works of art that were inconsistent, lacking in quality, generally unsellable, and failed to meet the standards of local clientele in breach of DIP Section 5;

l. Failing to provide "benefits from the supply system, prices, quality assurance, and artistic expertise of the Franchisor, who will to ensure that the Franchisee can always provide its client base an adequate and sufficient catalogue based on their needs" as promised in DIP Section 5;

m. Failure to promote the franchisor's brand and image and to maintain and increase notoriety in Plaintiffs' territory in breach of DIP Section 6;

n. Failure to develop and provide marketing plans in breach of DIP Section 6;

o. Providing a website that included pricing which ultimately competed with Plaintiffs' franchise rather than a website that merely provided merchandise, technical innovations, etc. in breach of DIP Section 6;

    p.  Failure to provide enjoyment of an adequate supply system, pricing structure, quality assurance and reliability provided by the franchisor in breach of DIP Section 12;

    q.  Taking compensation beyond the seven percent (7%) franchise fee imposed on total revenue earned by Plaintiffs, including taking seven percent (7%) of the cost of shipping charged to customers and commissions derived from an eight-to-nine percent (8-9%) spread between the cost of art paid to Carre d'artistes and what artists actually got paid per artwork, in breach of DIP Section 20.

108.    As a direct and proximate result of these breaches of the DIP by Carre d'artistes, Plaintiffs incurred damages.

109.    Additionally, Florida law recognizes the implied covenant of good faith and fair dealing in all contracts, as long as it relates to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements.

110.    Carre d'artistes breached the covenant of good faith and fair dealing found in the DIP based on the breaches identified in this Count.

WHEREFORE, Plaintiffs, Artier, LLC, Eduardo Castaneda and Martha Blanco, demand judgment against Defendant, Carre d'artistes SAS, for actual damages, plus pre-judgment interest, a reasonable attorney's fee, court costs and such other and further relief as the Court may deem just and proper.

## COUNT V

## VIOLATION OF FLORIDA BUSINESS OPPORTUNITIES ACT
## FLA. STAT. § 559.801 *et seq.* AGAINST ALL DEFENDANTS

111.    Paragraphs 1 through 73 are re-alleged and incorporated by reference.

112.    Defendants, Carre d'artistes and Carre USA, sold products, equipment, supplies and/or services to Plaintiffs to enable Plaintiffs to become a franchisee in Florida.

113.    To become a franchisee and area developer, Plaintiffs were required to pay an upfront fee which exceeded $500.

114.    Defendants, Carre d'artistes and Carre USA, through the Individual Carre Defendants, represented, among other things, that they would provide Plaintiffs with a sales or marketing program enabling Plaintiffs to derive income from the business opportunity provided by Carre d'artistes, within the meaning of the Florida Sale of Business Opportunities Act § 559.801 ("FSBOA").

115.    Without limitation, Defendants violated the FSBOA by ways that include, but are not limited to, making misrepresentations concerning their expertise and knowledge of the services and products offered and sold to Plaintiffs; making fraudulent earning claims; making misrepresentations concerning earnings, and third-party vendors; failure to uphold even minimal standards in operating a franchise system; failure to provide proper and adequate support and assistance; failure to provide proper training and marketing; making multiple misrepresentations as to the alleged expertise and sophistication of franchisor; lack of proper assistance by franchisor; failure to properly maintain the high standards supposedly set by franchisor in connection with its franchise system; failing to provide assistance to the franchisee in the establishment of its franchise; failing to create, improve and/or maintain brand recognition or brand loyalty; directing

36

Plaintiffs to purchase artwork that was unsellable; and numerous other misrepresentations and breaches of the DIP identified in Counts III and IV above.

116.     The sale of products, equipment, supplies and/or services to Plaintiffs is not exempt from the disclosure and other requirements of the FSBOA.

117.     Defendants' actions and omissions in violation of these described provisions of the FSBOA entitle Plaintiffs to bring this action to recover damages, and for an award of reasonable attorney's fees.

118.     Plaintiffs' remedies under the FSBOA are not exclusive, but are in addition to any other remedies to which Plaintiffs may be entitled at law or in equity.

119.     Plaintiffs have been injured by Defendants due to their violation of FSBOA and therefore may bring a private action for recovery of damages including attorney's fees.

WHEREFORE, Plaintiffs, Artier, LLC, Eduardo Castaneda and Martha Blanco, demand judgment against Defendants for actual damages, plus pre-judgment interest, a reasonable attorney's fee, court costs and such other and further relief as the Court may deem just and proper.

## COUNT VI

## UNJUST ENRICHMENT

120.     Paragraphs 1 through 73 are re-alleged and incorporated by reference.

121.     Defendants received payments from Plaintiffs.

122.     Defendants were aware they were receiving that benefit.

123.     Defendants accepted and retained that benefit under circumstances that it would be inequitable for them to retain that benefit.

124.     Defendants should be compelled to return the amount of these payments to Plaintiffs.

WHEREFORE, Plaintiffs, Artier, LLC, Eduardo Castaneda and Martha Blanco, demand judgment against Defendants for actual damages, plus pre-judgment interest, a reasonable attorney's fee, court costs and such other and further relief as the Court may deem just and proper.

### COUNT VII

### RESCISSION

125.    Paragraphs 1 through 73 are re-alleged and incorporated by reference.

126.    This count is being pled in the alternative to the above counts.

127.    Plaintiffs and Carre d'artistes lie in contractual privity as they entered into the DIP.

128.    Under Florida law, rescission may be granted where a party breaches a term that is an essential part of the bargain between contracting parties, such that a contract is essentially destroyed.

129.    Carre d'artistes breached an essential term of the bargain between the parties by:

   a. Disregarding and violating Amended FTC Franchise Rule which, in turn, creates *per se* liability under FDUTPA; and

   b. Breaching the DIP in the numerous ways as set forth herein; and

   c. Making numerous false and fraudulent misrepresentations to induce Plaintiffs into purchasing a franchise opportunity.

130.    As a result of these acts, there has been a total failure of consideration for which Plaintiffs have paid to Carre d'artistes and to third parties in order to open his business.

131.    Plaintiffs' consent to signing the DIP was given based on multiple misrepresentations of fact.

132.    Therefore, Plaintiffs seek a rescission of the DIP because enforcement of this contract would be unconscionable under the circumstances.

133.    Plaintiffs notified Defendants in writing that they were seeking a rescission of the DIP and/or intended to rescind the DIP.

134.    Plaintiffs are requesting that this Honorable Court adjust the equities among the parties and ensure restoration of the status quo before the parties entered into the DIP.

WHEREFORE, Plaintiffs, Artier, LLC, Eduardo Castaneda and Martha Blanco, demand judgment against Defendants for actual damages, plus pre-judgment interest, reasonable attorney's fees, court costs and such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demands a trial by jury on all issues so triable.

Respectfully submitted on this 22nd day of May, 2017 by,

*/s/ Adam G. Wasch*_____
Adam G. Wasch
Florida Bar No. 071082
awasch@waschraines.com
WASCH RAINES LLP
2500 N. Military Trail, Suite 465
Boca Raton, FL 33431
Tel: (561) 693-3221
Fax: (561) 404-1104

*Attorneys for Plaintiffs Artier, LLC, Eduardo Castaneda and Martha Blanco*